**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| VIPUL SHAH, DOLPH HAEGE, AND SAMEMMA HOLDINGS, LLC, STEVE WIONS, individually and on behalf of all others similarly situated, | § § § § § § § | Civil Action No.: 1:25-cv-383 <br><br> <u>CLASS ACTION COMPLAINT</u> |
| Plaintiffs, | § § | |
| vs. | § § | <u>JURY TRIAL DEMANDED</u> |
| CROWDSTREET, INC., TORE STEEN, and IAN FORMIGLE, | § § § | |
| Defendants. | § | |

Plaintiffs Vipul Shah, Dolph Haege, Samemma Holdings, LLC, and Steven Wions

("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs'

undersigned attorneys, for Plaintiffs' complaint against Defendants CrowdStreet, Inc., Tore

Steen, and Ian Formigle ("CrowdStreet" or "Defendants"), as follows:

**NATURE OF THE ACTION**

1.    This action seeks the rescission of more than $1 billion of investments made through

CrowdStreet while it was operating as an unregistered broker-dealer offering securities to

investors across the United States.

2.    Since 2012, CrowdStreet purported to operate an online marketplace (the "Platform")

through which its users (investors) purchased securities offered for sale by issuers of securities

(typically real estate sponsors or developers).

3.    According to its website, thousands of investors have invested over $4.16 billion in more

than 777 investments through the CrowdStreet platform since inception. In 2021 alone,

CrowdStreet raised more than $1.2 billion from investors like the Plaintiffs and the Class for private placement real estate securities offerings.

4.      From 2012 through 2022, CrowdStreet acted as a securities broker without registering as a broker dealer with the State of Texas or any other authority.

5.      During that time period, issuers of securities paid CrowdStreet transaction-based compensation for use of the CrowdStreet's online securities platform (the "Platform") to (i) offer and sell their securities for sale or delivery to investors through the Platform; (ii) solicit subscriptions to or orders for securities offered on the Platform; (iii) invite offers from investors for securities through the Platform; and (iv) to serve as an intermediary between the investors and issuers by distributing securities offering documents to investors through the Platform, collecting and delivering to the issuer subscription documents for investors purchasing securities offered by the issuer through the Platform. Each of these functions is traditionally the domain of a registered broker-dealer as defined under federal securities laws, as well as the Texas Securities Act.

6.      As a result, at all relevant times herein, CrowdStreet was not operating as a "marketplace" — it was operating as a broker-dealer under state and federal law.

7.      Despite acting in all material respects as a broker-dealer, CrowdStreet failed to register as a broker-dealer until mid-2022 — more than a decade after its inception. There is no valid exemption from broker-dealer registration which CrowdStreet can rely on.

8.      By failing to register as a broker-dealer and not qualifying for any applicable exemption from registration, CrowdStreet has defied a regulatory regime that Congress and the State of Texas constructed to serve as a cornerstone of investor protection in the capital markets — all while earning tens of millions of dollars in transaction-based compensation along the way.

9.     Naturally, as a sophisticated financial services firm, CrowdStreet was at all relevant times aware that it was operating in a regulated environment. And like any regulatory scheme, broker-dealer registration comes with additional burdens on the broker-dealer in terms of operational controls and supervisory structures. These operational and supervisory controls — such as strict due diligence obligations and the required use of escrow accounts — are beneficial to both investors and broker-dealers to help prevent and detect securities frauds.

10.     CrowdStreet's intentional evasion of the regulatory scheme set forth by Congress and the State of Texas is precisely what led to a $50 million investment fraud that impacted hundreds of CrowdStreet investors, which is an example of how CrowdStreet's failure to register directly and proximately causes actual and imminent harm to investors, including Plaintiffs and the Class Members.

11.     As a direct and proximate result of CrowdStreet's violations of the Texas Securities Act, the Plaintiffs and Class Members now seek to rescind the investments they purchased from CrowdStreet and seek to disgorge any ill-gotten gains CrowdStreet obtained through such offerings.

### JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter presented by this class action complaint because it is a class action arising under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 102-2, 119 Stat. 4 (2005), which explicitly provides for the original jurisdiction of the federal courts of any class action in which any member of the Plaintiffs class is a citizen of a state different from any defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

13.     Plaintiffs allege that the total claims of the individual members of the Class in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).

14.     Plaintiffs are citizens of North Carolina, Illinois, and Maryland, and as set forth below, CrowdStreet is a citizen of Texas. Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A) because "any member of a class of plaintiffs is a citizen of a State different from any defendant."

15.     Furthermore, Plaintiffs allege that more than two-thirds of all of the members of the proposed Class (as defined below) in the aggregate are citizens of a state other than Texas, in which this action is originally being filed, and that the total number of members of the proposed Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

16.     Venue in this judicial district is proper pursuant to 28 U.S.C. § 1391 because, as set forth below, CrowdStreet conducts business in, and may be found in, this District.

## PARTIES

17.     Plaintiff Vipul Shah ("Shah") is a citizen of North Carolina and was at all relevant times domiciled in North Carolina. At all relevant times Plaintiff Shah maintained an Investing Account with CrowdStreet, and purchased securities offered and sold by CrowdStreet through his Investing Account. Plaintiff Shah was a customer of both CrowdStreet and CrowdStreet Capital, LLC ("CrowdStreet Capital").

18.     Plaintiff Dolph Haege ("Haege") is a citizen of Illinois and was at all relevant times domiciled in Illinois. At all relevant times Plaintiff Haege maintained an Investing Account with CrowdStreet, and purchased securities offered and sold by CrowdStreet through his Investing

Account. At all relevant times Plaintiff Haege was a customer of both CrowdStreet and CrowdStreet Capital.

19.    Plaintiff Samemma Holdings, LLC ("Samemma") is a limited liability company formed in Maryland by Plaintiff Steven Wions, and was at all relevant times a citizen of Maryland. At all relevant times Plaintiff Samemma maintained an Investing Account with CrowdStreet, and purchased securities offered and sold by CrowdStreet through his Investing Account. At all relevant times Plaintiff Samemma was a customer of both CrowdStreet and CrowdStreet Capital.

20.    Plaintiff Steven Wions ("Wions") is a citizen of Maryland and was at all relevant times domiciled in Maryland. At all relevant times Plaintiff Wions was the sole member of Samemma Holdings, LLC, and maintained an Investing Account with CrowdStreet by and through Samemma Holdings through which he purchased securities offered and sold by CrowdStreet through his Investing Account. At all relevant times Plaintiff Wions was a customer of both CrowdStreet and CrowdStreet Capital, LLC.

21.    Defendant CrowdStreet, Inc. ("CrowdStreet") is a Delaware corporation that at all relevant times maintained is headquarters and principal place of business at 98 San Jacinto Blvd #400, Austin, TX 78701. CrowdStreet is a financial services company that provides securities brokerage services for real estate sponsors and retail investors. At all relevant times, CrowdStreet offered and sold securities to investors across the United States. CrowdStreet was never registered with the SEC, FINRA, or the State of Texas as a securities broker-dealer or funding portal. CrowdStreet has been identified as an owner of CrowdStreet Capital since 2018, and directs the policies and management of CrowdStreet Capital. CrowdStreet is therefore a "control person" over CrowdStreet Capital as defined under federal securities laws and the Texas Securities Act.

22.     Tore Steen was the co-founder of CrowdStreet, Inc., and during certain relevant times herein served as the Chief Executive Officer of CrowdStreet, Inc. Mr. Steen is a resident of Austin, Texas. During certain relevant times, Mr. Steen was a "control person" over CrowdStreet in that he directly or indirectly controlled CrowdStreet given his role as CEO, as well as his ownership interest in CrowdStreet, Inc. Upon information and belief, Mr. Steen was closely involved in the business decision to operate CrowdStreet as an unregistered broker-dealer.

23.     Ian Formigle was during certain relevant times herein served as the Chief Investment Officer of CrowdStreet, Inc. Mr. Steen is a resident of Bend, Oregon, and at all relevant times transacted business within the Western District of Texas. During certain relevant times, Mr. Formigle was a "control person" over CrowdStreet in that he directly or indirectly controlled CrowdStreet given his role as CIO, as well as his ownership interest in CrowdStreet, Inc. Upon information and belief, Mr. Formigle was closely involved in the business decision to operate CrowdStreet as an unregistered broker-dealer.

24.     Non-party CrowdStreet Capital, LLC ("CrowdStreet Capital") is a financial services company that provides securities brokerage services for real estate sponsors and retail investors. At all relevant times, CrowdStreet Capital's principal place of business was in Austin, Texas, with an address at 98 San Jacinto Blvd #400, Austin, TX 78701. CrowdStreet Capital (CRD # 312762) has been registered with FINRA as a securities broker-dealer since May 2, 2022, and with the State of Texas since June 15, 2022.

25.     Tore Steen and Ian Formigle are referred to herein as the "Control Person Defendants".

## FACTUAL BACKGROUND

### A.    The Regulatory Scheme for Broker-Dealers in the United States and Texas

26.    Broker-dealers have long played a pivotal role in maintaining the integrity of the capital markets in the United States. Congress, the Securities and Exchange Commission ("SEC"), and state securities regulators have relied on this regulatory scheme to protect investors.

27.    The SEC has long considered the relationship between a broker and their customers to be one of "trust and confidence", or special in nature. This special relationship between brokers and their customers has developed into a doctrine referred to as the "Shingle Theory" — which provides that a broker, by virtue of their being in the securities business by "hanging out a shingle", owes the customers various extra-contractual duties which include the obligation to deal fairly with its customers. The Shingle Theory has evolved to encompass liability for a wide variety of acts and omissions, and the SEC has consistently considered the representation that a customer will be dealt with fairly and in accordance with professional standards as "inherent" in the broker-customer relationship.

28.    In consideration for the privilege of operating as a broker-dealer, the SEC and state securities regulators require broker-dealers to register unless a valid exemption from registration applies. Registering as a broker-dealer is an expensive and complex endeavor, as broker-dealers must register with the SEC, become a member of FINRA, satisfy various training requirements, and adhere to rigorous financial reporting and capital requirements. Moreover, once registered, broker-dealers must adhere to rules promulgated by FINRA, and are subject to discipline by FINRA (or even the SEC) for violations of said rules.

29.    Congress and state legislatures, like the State of Texas, have determined that such registration, oversight, and rigorous supervision and operational controls are necessary for the functioning of efficient capital markets and for investor protection.

30.    The Securities Exchange Act of 1934 ("Exchange Act" or "Act") governs the way in which the nation's securities markets and its brokers and dealers operate. Section 3(a)(4)(A) of the Act generally defines a "broker" broadly as "any person engaged in the business of effecting transactions in securities for the account of others."

31.    In its Guide to Broker-Dealer Registration, the SEC has offered guidance for those participants in the capital markets. The SEC stated that:

> Sometimes you can easily determine if someone is a broker. For instance, a person who executes transactions for others on a securities exchange clearly is a broker. However, other situations are less clear. For example, each of the following individuals and businesses may need to register as a broker, depending on a number of factors:
>
> - "Finders", "business brokers," and other individuals or entities that engage in the following activities:
>
>   o    Finding investors or customers for, making referrals to, or splitting commissions with registered broker-dealers, investment companies (or mutual funds, including hedge funds) or other securities intermediaries;
>   o    Finding investment banking clients for registered broker-dealers;
>   o    Finding investors for "issuers" (entities issuing securities), even in a "consultant" capacity;
>   o    Engaging in, or finding investors for, venture capital or "angel" financings, including private placements;
>   o    Finding buyers and sellers of businesses (i.e., activities relating to mergers and acquisitions where securities are involved);
>
> - Investment advisers and financial consultants;
> - Foreign broker-dealers that cannot rely on Rule 15a-6 under the Act (discussed below);
> - Persons that operate or control electronic or other platforms to trade securities;

- Persons that market real-estate investment interests, such as tenancy-in-common interests, that are securities; Persons that act as "placement agents" for private placements of securities;
- Persons that market or effect transactions in insurance products that are securities, such as variable annuities, or other investment products that are securities;
- Persons that effect securities transactions for the account of others for a fee, even when those other people are friends or family members;
- Persons that provide support services to registered broker-dealers; and
- Persons that act as "independent contractors," but are not "associated persons" of a broker-dealer (for information on "associated persons," see below).[1]

32. The SEC also provided guidance on what it considers to be the hallmarks of broker-dealer activity. The SEC states that:

> In order to determine whether any of these individuals (or any other person or business) is a broker, we look at the activities that the person or business actually performs. You can find analyses of various activities in the decisions of federal courts and our own no-action and interpretive letters. Here are some of the questions that you should ask to determine whether you are acting as a broker:
>
> - Do you participate in important parts of a securities transaction, including solicitation, negotiation, or execution of the transaction?
> - Does your compensation for participation in the transaction depend upon, or is it related to, the outcome or size of the transaction or deal? Do you receive trailing commissions, such as 12b-1 fees? Do you receive any other transaction-related compensation?
> - Are you otherwise engaged in the business of effecting or facilitating securities transactions?
> - Do you handle the securities or funds of others in connection with securities transactions?
>
> A "yes" answer to any of these questions indicates that you may need to register as a broker.[2]

33. A key factor in the SEC's analysis of what constitutes broker-dealer activity is the receipt of transaction-based compensation (*i.e.*, compensation tied directly to a successful investment in

---

[1] https://www.sec.gov/about/reports-publications/investor-publications/guide-broker-dealer-registration (April 2008).

[2] *Id.*

9

the issuer's securities by an investor introduced to the issuer by the person or entity) for effecting a transaction in securities, or for inducing the purchase of securities, to be a hallmark of broker-dealer activity. The SEC has stated that it believes that the receipt of transaction-based compensation gives the person offering and selling such securities a "salesman's stake" in a proposed offering and creates a heightened incentive for a finder to engage in sales efforts.

34.    The Texas Securities Act (the "TSA") definition of a broker-dealer is even broader than the SEC's definition. Under the TSA, a broker is defined as a "dealer" as defined in the TSA. Sec. 4001.054. Therefore, activities that fall within the activities of a dealer under the TSA apply to brokers and dealers.

35.    Section 4001.056 of the TSA defines a "dealer" as:

(a) "Dealer" includes:

(1) a person or company, other than an agent, who for all or part of the person's or company's time engages in this state, directly or through an agent, in selling, offering for sale or delivery, soliciting subscriptions to or orders for, undertaking to dispose of, or inviting offers for any security; and
(2) a person or company who deals in any other manner in any security in this state.

(b) Except as provided by Subsection (c), an issuer, other than a registered dealer, who directly or through any person or company, other than a registered dealer, offers for sale, sells, or makes sales of the issuer's own securities is deemed a dealer and shall comply with this title.

(c) An issuer is not deemed a dealer under Subsection (b) if:

(1) the issuer sells or offers for sale securities to a registered dealer or only by or through a registered dealer acting as fiscal agent for the issuer; or
(2) the transaction is exempt as provided by Subchapter A, Chapter 4005.

(d) Except as expressly provided otherwise in this title, a person or company engaged in the sale of, offer for sale of, solicitation of, subscription to, dealing in, or delivery of a security made in a transaction or under a condition specified in Subchapter A, Chapter 4005, is not deemed a dealer within the meaning of this title.

36.    If the activities of a person or entity fall within the definition of a broker-dealer, they must be associated with a broker-dealer, or register as a broker-dealer in order to comply with state and federal securities laws.

37.    This registration and regulatory scheme establishes rules, duties, prohibitions, surveillance and supervision mechanisms, capital requirements, and recordkeeping obligations.

38.    To comply with this regulatory scheme, under Section 15(b)(1) of the 1934 Act, entities operating as broker-dealers are required to apply for registration as a broker-dealer with the SEC, and under Section 15(b)(8) of the 1934 Act they must apply and be approved for membership with the Financial Industry Regulatory Authority (FINRA).

39.    In addition, broker-dealers must be approved in each state they intend to conduct securities business in.

40.    Indeed, under the TSA, the State of Texas requires that broker-dealers be registered.

> Sec. 4004.051. Registration of Dealers Required. Except as provided by Section 4001.056(d) or Subchapter A, Chapter 4005, a dealer or other person or company, including a corporation or firm, may not, directly or through the dealer's or other person's or company's agents, offer for sale, sell, or make a sale of any securities in this state unless the dealer or other person or company is first registered as provided by this chapter.

41.    While there are certain limited exceptions to registration under the 1934 Act and the TSA, the burden rests on the entity engaging in broker-dealer activity to establish that they fall within a recognized exemption.

42.    It is no surprise that the consequences of failing to register as a broker-dealer are severe. In addition to injunctive or disciplinary action that can be brought by the SEC, private litigants are entitled to bring actions for rescission of the investments recommended and sold by the unregistered broker-dealer firm.

11

### B.    CrowdStreet's Business Model and Broker-Dealer Activities

43.    CrowdStreet was formed in or about 2012 by Tore Steen, and at all relevant times purported to be a mere crowdfunding "marketplace" for real estate investments.

44.    By 2022, CrowdStreet grew to one of the largest online crowdfunding marketplaces in the United States, with more than 240,000 members who each invested $25,000 or more into various real estate investments.

45.    According to its website, by July 2023, CrowdStreet helped more than 330 investment sponsors raise more than $4.2 billion for over 790 investments that were marketed and sold to investors through the CrowdStreet online marketplace. CrowdStreet continually offered and sold securities through the CrowdStreet online marketplace through 2024.

46.    The securities offered and sold through the CrowdStreet marketplace are predominately securities exempt from registration under Regulation D of the Securities Act of 1933 (the "1933 Act"). Regulation D exempt securities are also referred to as "private placements".

47.    CrowdStreet's business model is straightforward. CrowdStreet represents that it "scour[s] the U.S. for experienced, successful, innovative sponsors that value and welcome individual investors to their projects." Each of these investment sponsors are "issuers" as defined under state and federal securities laws.

48.     CrowdStreet's website provides:

**QUALITY AND EXPERIENCE**

# Deal Sourcing and CrowdStreet Review:

We scour the U.S. for experienced, successful, and innovative sponsors that value and welcome individual investors into their projects.

As part of our screening process, we evaluate the sponsor, their management team, and their track record. Next, we dig into the deal's business plan and market assumptions as thoroughly as possible to determine if it's a good fit for the Marketplace.

We know that you rely on us for both deal flow and deal review.

The CrowdStreet Review Process helps ensure that our Investments team analyzes each deal against the same criteria without sacrificing the pace at which we introduce new sponsors and launch new deals.

Read more about the CrowdStreet Review Process >

49.     Once an investment sponsor is interested in selling their securities through the CrowdStreet marketplace, CrowdStreet acts in a broker capacity by conducting due diligence on the sponsor and vetting those sponsors' securities issuances before approving their securities for offering and sale on the marketplace.

50.     CrowdStreet represents to its investors that only 1 in 20 deals (5%) that it conducts due diligence on are approved for offer and sale through to CrowdStreet's investors.

51.    CrowdStreet's website provides:

**OUR INVESTMENT SCREENING PROCESS**

# Providing Access to a Range of Deals

Our Investments Team is on the ground across the country, searching for compelling real estate projects from experienced sponsors. We recognize that when it comes to investing, there's no one-size-fits-all solution. That's why we work to bring a variety of quality investment opportunities to the CrowdStreet platform. We take a highly selective approach, with only about 1 in 20 deals we review ultimately approved and launched on our platform.[1]

Rigor and transparency are at the core of our review process. Our FINRA-licensed, experienced team of real estate professionals conducts an extensive screening process for both sponsors and investment opportunities before approving them for our platform. We then publish a detailed checklist for each offering so investors know exactly what vetting we've undertaken as they evaluate the investment opportunity.

52.    Once a deal is approved, CrowdStreet acts in a broker capacity by building a comprehensive sales and marketing campaign for the offer and sale of the sponsor's securities to CrowdStreet's captive clients through the CrowdStreet marketplace.

53.    CrowdStreet creates this sales and marketing campaign from information provided by the sponsor as well as its own independent research.

54.    CrowdStreet then builds a detailed securities offering page for the sponsor/deal, and pairs this with a digital sales and marketing campaign to offer, sell, invite offers, and otherwise solicit investors who are CrowdStreet members (such as the Plaintiffs and the Class).

55.    CrowdStreet refers to these brokerage services as the "Publishing Platform".

56.    In order to invest through CrowdStreet, investors must open what is referred to as an "Investing Account" with CrowdStreet.

57.    To do so, investors must create a login on the CrowdStreet website and complete a user profile providing certain information about the investor (or their entity).

58.     In connection with opening an Investing Account, CrowdStreet attempts to bind investors to its applicable terms and conditions, which are governed by Texas law.

59.     After establishing an Investing Account with CrowdStreet, CrowdStreet acts in a broker capacity and offers brokerage services by requiring the investors to verify certain facts and certify that they are an accredited investor, and in some instances to sign an Investing Account agreement — which creates a contractual relationship between the investor, CrowdStreet and CrowdStreet Capital.

60.     The means for effecting securities transactions through the CrowdStreet Platform consists of five steps: 1) the Evaluation Period, 2) Submit Offer, 3) Investing Account Selection, 4) Signing Documents, and 5) Investment Funding.

61.     CrowdStreet provides its investors with detailed instructions and videos on each of these steps of the securities transaction. CrowdStreet refers to this service as the "Transaction Center".

62.     CrowdStreet's website provides:

## Offer process overview

| Table of Contents | | |
| --- | --- | --- |
| Overview | Walk-Through Video | Evaluation Period |
| Submit Offer | Account Selection | Sign Documents |
| Investment Funding | Oversubscription | Withdrawing an Offer |

There are 5 stages of the offer process:

- Evaluation period
- Submit offer
- Investing Account Selection
- Signing documents
- Investment Funding

15

63.     The first step in the securities transaction process is what CrowdStreet refers to as the "Evaluation Period".

64.     The Evaluation Period begins when a securities offering goes live for offer and sale on the CrowdStreet marketplace. At this point in time, CrowdStreet's captive investor client base can access the securities offering detail page created by CrowdStreet.

65.     CrowdStreet serves as an intermediary, renders brokerage services, and acts in a broker capacity by distributing key securities offering documentation to the investor through the securities offering page, including the offering documents (private placement memorandum), and various other details about the offering (such as financial statements).

66.     At the end of the Evaluation Period, CrowdStreet renders brokerage services and acts in a broker capacity by hosting a live sales webinar with the sponsor to answer any questions from investors before the deal becomes open for purchase requests by investors.

67.     If an investor is interested in purchasing the securities offered by CrowdStreet in a particular sponsor, they can initiate a purchase order through their CrowdStreet account. They access the Investment Commitment page to fill in the dollar amount for the purchase order, and click a "Submit Offer" button on the CrowdStreet website. CrowdStreet serves as an intermediary, renders brokerage services, and acts in a broker capacity by relaying this purchase order to the sponsor on the investor's behalf for review and execution.

68.     The investor then selects which Investing Account on the CrowdStreet Platform that they intend to effectuate the purchase order with.

69.     After the Investing Account is selected, CrowdStreet serves as an intermediary, renders brokerage services, and acts in a broker capacity by distributing subscription documents prepared by the sponsor (issuer) to the investor to review and execute in order to effectuate the securities

purchase. Once the documents are executed by the investor, CrowdStreet serves as an intermediary, renders brokerage services, and acts in a broker capacity by having a member of the CrowdStreet Investor Relations team review the executed securities subscription documents prior to distribution to the sponsor.

70.     Once this review is complete, CrowdStreet serves as an intermediary, renders brokerage services, and acts in a broker capacity by accepting the purchase order on behalf of the sponsor, and distributing funding instructions to the investor — which the investor follows to fund the purchase order.

71.     After the funding of a purchase is complete, CrowdStreet acts in a broker capacity by creating an "investor room", which is a post-closing portion of the CrowdStreet website where investors can access information about the investment, and sponsors can have CrowdStreet upload archive of the executed transactional documents, and provide ongoing information to investors such as account balances, distribution information, performance metrics, financial statements, and tax records. CrowdStreet refers to this brokerage service as the "Investor Rooms".

72.     The information provided in the "Investor Rooms" consists of exactly the same type of documents and information investors would be provided in an online portal with any conventional registered broker-dealer. In other words, there is no functional difference between what CrowdStreet provides to the Plaintiffs and the Class Members in the Investor Rooms and in the Investing Accounts and what a brokerage firm (e.g.  Morgan Stanley or Charles Schwab) would provide to its brokerage clients.

73.     For sponsors, CrowdStreet serves as an intermediary, renders brokerage services, and acts in a broker capacity by providing an administrative portal for sponsors which enables a host of

17

transaction related services, including the ability to review investor leads, offers, signed documents, accredited investor verification, funding, and investor communications. CrowdStreet refers to this service as the "Management Console".

74.    In order to earn revenue for operating the marketplace, CrowdStreet acts in a broker capacity by charging various fees to sponsors — which are contingent on the outcome of the offering. Such fees are ultimately paid for by the investors as they are deducted from the investors' funds post-closing.

75.    The fees charged by CrowdStreet include a non-refundable "on-boarding fee", which is a deposit to start the onboarding process which is applied to a final solution "deployment fee".

76.    At the conclusion of the use of the Publishing Platform and the Transaction Center, CrowdStreet acts in a broker capacity by charging sponsors what it refers to as a "solution deployment fee". This is a one-time, variable fee that depends on the number of Investor Rooms that are created. The more investors, the more CrowdStreet gets paid.

77.    Because this is a variable fee payable post-closing, it is contingent on the size and outcome of the offering and therefore constitutes transaction-based compensation, which is one of the primary hallmarks of broker-dealer activity and compensation.

78.    In other words, this "solution deployment fee" constitutes transaction-based based compensation which would require CrowdStreet to register as a broker-dealer.

79.    An example of this is:

**4. License Fees**

A $15,000 nonrefundable **on-boarding fee** will be paid upon the date this proposal is signed by Customer (the "Effective Date") and applied toward the final solution deployment fee.

Upon the conclusion of the Customer's use of the Publishing Platform and Transaction Center, a one-time **solution deployment fee** based on the number of Investor Rooms (as defined in the Marketplace Services Agreement) created will be calculated according to the following table and due upon receipt of invoice.

| # of Investor Rooms/Positions | | |
|---|---|---|
| Min | Max | Price Per Investor Room |
| 1 | 10 | $2,200 |
| 11 | 25 | $1,600 |
| 26 | N | $1,200 |

**For Illustration Purposes**: If 20 Investor Rooms are created then the solution deployment fee shall be calculated as follows:

Investor Rooms 1-10: 10 x $2,200 = $22,000
Investor Rooms 11-20: 10 x $1,600 = $16,000
Deployment Fee: $22,000 + $16,000 - $15,000 onboarding fee = $23,000

Customer shall also be subject to an **annual solution fee** based on the total number of active Investor Rooms for the Project at a rate of $200 per Investor Room. Annual solution fees will be charged and due on each anniversary of the Effective Date during the Management Phase (defined below). For the avoidance of doubt, annual solution fees will not be subject to proration or rebate. [3]

80.  In addition, CrowdStreet charges the sponsors an "annual solution fee", which is a fee to maintain each Investor Room.

81.  Upon information and belief, the deployment fee is also payable by the sponsor at the closing of the offering CrowdStreet was engaged to solicit its investors for and is therefore contingent on the offering size.

---

[3] Excerpt from the December 19, 2019 CrowdStreet Marketplace Proposal to BDR Capital Partners, LLC regarding the Sonata at Columbia Station securities offering.

82.    The annual solution fee is also a fee that is completely contingent on a successful offering, and is variable depending on how many Investor Rooms are created – as the more Investors Rooms are created, the more annual solution fee revenue CrowdStreet earns.

83.    Therefore, the "annual solution fee" also constitutes transaction-based compensation which is a hallmark of broker-dealer activity, and which would require CrowdStreet to register as a broker-dealer.

84.    The total fees charged by CrowdStreet ranged between 5–14% of the total funds raised, which is equivalent to what a broker-dealer's commission would be for the same or similar services. As a result, the "salesman's stake" that CrowdStreet has in any given securities offering is equivalent to that of what any broker-dealer would have.

85.    As a result, the various "fees" that CrowdStreet charges are nothing more than transaction-based compensation which is consistent with one of the hallmarks broker-dealer activity. In apparent recognition of this, CrowdStreet has tried to avoid this by labeling its broker's commission as a purported technology fee, but that mere label fails to change what it is: transaction-based compensation consistent with its broker-dealer role.

## C.    CrowdStreet Operated as an Unregistered Broker-Dealer

86.    The entire legislative intent behind the broker-dealer regulator scheme is to protect investors through the regulation of transactions in securities.

87.    As the Fifth Circuit has stated, the broker-dealer registration requirement is "of the utmost importance in effecting the purpose[] of the [Exchange] Act," because registration facilitates both discipline "over those who may engage in the securities business" and oversight "by which necessary standards may be established with respect to training, experience, and

records." *Reg'l Properties, Inc. v. Fin. Real Estate Consulting Co*., 678 F.2d 552, 561 (5th Cir.

1982); *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 362 (5th Cir. 1968).

88.    All broker-dealers in the United States are subject to the jurisdiction of the SEC, and

must become members of the Financial Industry Regulatory Authority ("FINRA").

89.    FINRA is a not for-profit, self-regulatory organization consisting of broker-dealer

member firms and its associated persons.

90.    FINRA regulates approximately 3,500 broker-dealers and 620,000 individuals registered

with broker-dealers across the United States.

91.    FINRA is overseen by the SEC and is authorized by Congress to protect U.S. investors

by making sure the broker-dealer industry operates fairly and honestly. Its stated mission is to

protect investors and promote market integrity.

92.    CrowdStreet was never registered as a broker-dealer with the SEC, the State of Texas,

and was never a FINRA member firm.

93.    In May 2022 — after operating for a decade without registering with the SEC, FINRA, or

any state securities regulator, CrowdStreet finally registered a wholly owned subsidiary —

CrowdStreet Capital, LLC — as a broker-dealer and FINRA member firm.

94.    In June 2022, CrowdStreet Capital registered as broker-dealer with the State of Texas.

95.    CrowdStreet is an "associated person" of CrowdStreet Capital under the applicable

FINRA rules as it is more than a 75% owner in CrowdStreet Capital, and can direct the

management or policies of CrowdStreet Capital. CrowdStreet and CrowdStreet Capital not only

share the same office address, but share the members of the management team (which for a time

included Defendant Ian Formigle).

96.    While there are a number of factors that the SEC looks at to determine whether or not a person or entity is "engaging in the business of effecting transactions in securities" which would trigger broker-dealer registration, perhaps the two most important factors are (i) whether the individual or entity regularly participates in securities transactions in key points of the chain of distribution, and (ii) whether the individual or entity receives transaction based-compensation.

97.    CrowdStreet's business model has all of the hallmarks of broker-dealer activity for engaging in the business of effecting transactions in securities, including but not limited to:

(i)    counseling sponsors on securities offerings through the CrowdStreet Platform;

(ii)    structuring securities offerings for the sponsor through the Platform;

(iii)    actively finding new investors to become members of the Platform and open Investing Accounts on the Platform;

(iv)    analyzing the financial needs of the sponsors;

(v)    conducting due diligence on sponsors and their securities offerings;

(vi)    making determinations and selecting specific securities offerings to offer and sell through the Platform;

(vii)    offering and selling securities for sale or delivery to investors through the Platform;

(viii)    soliciting subscriptions to or orders for securities offered on the Platform;

(ix)    inviting offers from investors for securities through the Platform;

(x)    serving as an intermediary between the investors and sponsors (issuers) during the securities offering;

(xi)    accepting purchase orders from investors for securities offerings on the Platform;

(xii)    distributing securities offering documents and subscription documents from the sponsors to the investor's distribution;

(xiii)   collecting and distributing executed subscription documents from the investors to the sponsors;

(xiv)   facilitating the funding of the investor purchase orders;

(xv)    archiving executed securities transactional documents on the CrowdStreet Platform; and

(xvi)   communicating and distributing post-closing transaction information from the sponsor to the investor through the CrowdStreet Platform. These are precisely the same activities that a broker-dealer would engage in.

98.    By virtue of its business model, at all relevant times between 2012 through 2024, CrowdStreet engaged in the business of effecting transactions in securities for compensation, and acted as a broker-dealer without registering as such.

99.    In fact, there is no functional difference between CrowdStreet and a registered broker-dealer that serves as a boutique investment bank, placement agent, or retail broker-dealer focused on private placement investments.

100.    CrowdStreet actively marketed its placement agent services to sponsors based on its representations that it helps sponsors "raise passive capital" and "manage those investors" on one platform.

101.    CrowdStreet's website provides:

# A new way to raise capital

Real estate sponsors have historically relied on a patchwork of offline funding sources, including friends and family, broker-dealers, and institutional capital to finance their projects. But with CrowdStreet you can gain access to a deep network of accredited investors, raise passive capital, and manage those investors with the help of our team—all on one unified platform.

**Let's Talk About Your Deal**

102.    CrowdStreet further represents to Sponsors that it would help "pitch [the Sponsor's] deal to [CrowdStreet's] investor network.

## What's The Process?

Our team is with you for the life of your project. From publishing your latest offerings, raising and accepting funds, to delivering investor tax documentation and distributions, the CrowdStreet platform digitizes each step, saving you time and money.



**Publishing your project**

Once your deal is approved, CrowdStreet builds all the elements needed for a comprehensive campaign. Combining information gleaned during both the deal screening and our independent research, we'll create an offering detail page that tells the story of your project. We pair this with a dedicated digital marketing campaign to officially launch your project to our investor network and reach new investors across the U.S.



**Raise and accept funds**

The investing window opens with a live webinar, co-hosted by CrowdStreet and your team. This is your chance for you to introduce your team and pitch your deal to our investor network. Plus, it gives your investors the chance to ask you more questions about your project. As we receive offers, our team will respond to inquiries and help move potential investors from submitting an offer to a receipt of funds.



**Ongoing investor management**

Designed for scale and efficiency, our team works alongside your employees to streamline the investor management process. Whether it's 40 or 400 investors, our investor management services will help you and your firm successfully manage your new investors for the lifecycle of their investment.

**Let's Talk About Your Deal**

103.    CrowdStreet, by its own admission, inserted itself at each and every key point in a private placement securities transaction, from marketing, distribution of offering documents, collection of investor offers, distribution of subscription agreements, collection of executed subscription agreements, distribution of funding instructions, confirmation of funding, and ultimately post-closing account management.

104.    By inserting itself in this fashion, it is in the identical position a registered broker-dealer would be in a private placement securities transaction.

105.    CrowdStreet's website provides:

# Launching Your Deal On The Marketplace.

CrowdStreet was built to streamline and modernize the commercial real estate investment process. We're making the entire capital raise process more efficient with a modern digital experience. With more than 798 closed deals, our team has helped 330+ sponsors across the U.S. raise over $4.2 billion from thousands of investors.

106.    Inserting itself in the same position as a broker-dealer was not an accident, but rather done by design. Executives and employees at CrowdStreet long recognized that it was operating as a broker-dealer and required full registration to continue to conduct its business.

107.    Based on internal documents presented to its employees, as far back as November 2021, CrowdStreet recognized that it needed to transition all of its business to a registered broker-dealer.

108.    Naturally, CrowdStreet would only contemplate a transition from an unregulated to a highly regulated environment if it were necessary to comply with applicable laws and regulations and if it recognized that it had not been acting properly before.

109.    According to CrowdStreet documents:



*Courtesy screenshot provided to Bisnow*

CrowdStreet Capital's launch plan, presented to employees in November 2021, shows its anticipated timeline to incorporate its broker-dealer activity. The plan was delayed by more than a year, leaving investors on the platform more vulnerable to illegal activity.

110.    This chart demonstrates that by at least 2021, CrowdStreet knew that it needed to fully transition to a registered broker-dealer.

111.    Despite this knowledge and recognition of the issue, and unfortunately for the Plaintiffs and the Class members, CrowdStreet offered and sold securities as an unregistered broker-dealer in violation of Texas law.

**D.    CrowdStreet Offered and Sold Over $1.2 Billion Worth of Securities to the Plaintiffs and the Class without Being Registered as a Broker-Dealer**

112.    Despite the fact that CrowdStreet knew or should have known that it was required to register as a broker-dealer with FINRA and the State of Texas to continue offering and selling securities to investors under its current business model, CrowdStreet failed to do so.

113.    CrowdStreet offered and sold hundreds of millions of dollars of securities in violation of these basic registration requirements which serve as the foundation for the capital markets in the United States.

114.    In 2021 alone, CrowdStreet raised over $1.2 billion for sponsors from retail investors through its marketplace. CrowdStreet continued offering and selling securities through its marketplace through at least 2024.

115.    In the abstract, the lack of registration as a broker-dealer may seem to be a technical violation as defendants accused of operating as an unregistered broker-dealer tend to argue. But this is far from the legislative intent of Congress and the State of Texas, and is why harsh penalties are imposed upon those operating as an unregistered-broker dealer.

116.    For investors, the regulatory protections afforded to them under this regulatory scheme are critical to protecting them from securities frauds.

117.    And perhaps no better example of why regulatory protection is critical to investor protection is the Nightingale securities offerings made through CrowdStreet.

      **E.    The Control Person Defendants Directly or Indirectly Controlled CrowdStreet, and are Jointly and Severally Liable**

118.    Upon information and belief, the decision to forego broker-dealer registration with FINRA and the State of Texas and operate as an unregistered broker-dealer was a calculated one not made by CrowdStreet alone. Instead, it was made with the direction of the Control Person Defendants, who each had the ability to directly or indirectly control CrowdStreet and provided material aid and assistance to CrowdStreet's broker-dealer operation.

119.    With regard to Tore Steen and Ian Formigle, each of them had served as senior executives for CrowdStreet and were intimately involved in the day-to-day operations of CrowdStreet and upon information and belief, the strategic planning to forgo broker-dealer

registration during the relevant time period. Both Messrs. Steen and Formigle had the direct or indirect ability to control CrowdStreet and its unregistered broker-dealer activities and were also upon information and belief, the architects of the business decision to prioritize growth as an unregistered broker-dealer over regulatory compliance by operating CrowdStreet with the regulatory burdens associated with broker-dealer registration.

120.    Mr. Steen and Mr. Formigle were intimately familiar with the regulatory environment in which CrowdStreet operated. Mr. Formigle was a licensed securities professional with various FINRA registered broker-dealers since 2002, and Mr. Steen was CEO of CrowdStreet when it devised its launch plan for the broker-dealer in 2021. In other words, at all relevant times, upon information and belief, Messrs. Steen and Formigle had actual knowledge of the requirement to register as a broker-dealer, and made an affirmative decision to avoid said registration.

121.    In addition to the direct or indirect control that the Control Person Defendants enjoyed, each one of them benefited from CrowdStreet's operation as an unregistered broker-dealer to the detriment of the Plaintiff and the Class. Messrs. Steen and Formigle received substantial salaries and bonuses from the revenue derived from CrowdStreet's operation as an unregistered broker-dealer, and sold their personal equity interests in CrowdStreet at substantial premiums that directly resulted from the accelerated growth of CrowdStreet from foregoing broker-dealer registration (and the regulatory burden that comes with it). As a result, the Control Person Defendants each enjoyed substantial benefits to the detriment of the Plaintiffs and the Class.

### F.    CrowdStreet's Failures Cause Investors to Lose Over $53 Million in a Brazen Securities Fraud Perpetrated by Nightingale Properties

122.    In 2022, CrowdStreet offered, solicited, and materially aided in the offer and sale of over $62 million in securities to 700 investors throughout the United States through the CrowdStreet

marketplace for Nightingale Properties, LLC — a New York City-based real-estate development firm ("Nightingale").

123.    The investment proposition for the projects Nightingale offered through CrowdStreet was to raise money to purchase and renovate office buildings in Atlanta and Miami which were priced at a discounted valuation due to deferred maintenance needs (i.e. the buildings were outdated and in need of renovation).[4]

124.    CrowdStreet aggressively offered and sold the Nightingale offerings to investors on the Platform.

125.    Based on the marketing, solicitation, offer, and sale of the Nightingale securities CrowdStreet, the Plaintiffs effected purchase orders for Nightingale through their CrowdStreet Investing Accounts as follows:

- Vipul Shah - $25,000 in ONH AFC CS Investors, LLC
- Dolph Haege - $25,000 in ONH 1601 CS Investors, LLC
- Dolph Haege - $30,000 in ONH AFC CS Investors, LLC
- Samemma Holdings, LLC - $25,000 ONH 1601 CS Investors, LLC

126.    Unfortunately for the Plaintiffs and all of the other investors who purchased the Nightingale securities offered and sold by CrowdStreet, the Nightingale offerings turned out to be a complete fraud.

127.    Despite raising over $62 million from CrowdStreet's customers, the Nightingale offerings never closed and virtually all of the money raised for the offerings through CrowdStreet was misappropriated and diverted by the CEO of Nightingale, Elie Schwartz – causing the Plaintiffs to suffer substantial damages.

---

[4] The legal entity for the Atlanta Financial Center Project was ONH AFC CS Investors, LLC, and the legal entity for the Miami Lincoln Place project was ONH 1601 CS Investors, LLC. Collectively, these securities offerings are referred to herein as the "Nightingale Offerings", and the securities offered by these entities are referred to herein as the Nightingale Securities".

### G.    Plaintiffs Have Suffered an Injury in Fact by Investing in CrowdStreet

128.    Each of the Plaintiffs and Class members have suffered an injury in fact by purchasing securities offered and sold by CrowdStreet in violation of its obligation to register as a broker-dealer.

129.    By virtue of their registration, broker-dealers are legally permitted to receive transaction-based compensation from their role in offering and selling securities to customers. Unregistered broker-dealers are not permitted to engage in the offer and sale of securities for compensation.

130.    The most that an unregistered firm like CrowdStreet would be legally able to do is to advertise various securities offerings to investors — and to charge a fee for such advertisement — not unlike what various publications (morningbrew.com) and periodicals (Wall Street Journal) do.

131.    CrowdStreet knew that it could not receive transaction-based compensation without registering as a broker-dealer, but attempted to disguise this transaction-based compensation as various "technology" fees.

132.    Ultimately, however, CrowdStreet took a "salesman's stake" in the offerings it offered and sold to the Plaintiffs and the Class — and earned a broker's commission in the process.

133.    The transaction-based compensation CrowdStreet illegally received was paid out by sponsors from the funds raised by the Plaintiffs and the Class.

134.    As a result, the Plaintiffs and the Class have suffered an injury in fact in that their hard-earned investment funds were used to pay CrowdStreet transaction-based compensation that it was not entitled to under Texas law.

135.    The impact of the transaction-based compensation paid to CrowdStreet using the monies invested by the Plaintiffs and the Class is substantial.

136.    For example, if the total transaction-based compensation paid to CrowdStreet was 7% of the funds raised, the sponsor would need to obtain a total return of 14% for the investors just so that the Plaintiffs and the Class could break even on their investment.

137.    Moreover, by acting as an unregistered broker-dealer, CrowdStreet offered and sold to the Plaintiffs and the Class many investments in sponsors through their Investing Accounts that turned out to be a partial or complete loss (including, but not limited to, Nightingale).

138.    The Plaintiffs and Class suffered injuries to the investments held in their CrowdStreet Investing Accounts. The injuries that the Plaintiffs and the Class have suffered as a result of CrowdStreet (i) extracting transaction-based compensation that it was not legally entitled to receive; and (ii) offering and selling securities without registering as a broker-dealer, can both be redressed by a favorable judicial decision ordering rescission of all investments tendered, disgorgement of illegally obtained commissions which unjustly enriched CrowdStreet to the detriment of the Plaintiffs and the Class, and injunctive relief to prevent this type of misconduct in the future.

## CLASS ACTION ALLEGATIONS

139.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"). The Class in this action ("Class") consists of a Nationwide Class (the "Class"):

### Nationwide Class

All persons who purchased any securities offered, sold, or otherwise displayed on the CrowdStreet Platform within the applicable statute of limitations period.

140.    Excluded from the Nationwide Class are the Defendants, any affiliates of or entities related to the Defendants, any investment funds operated by the Defendants, all offices, directors, employees, executives of the Defendants, any bankruptcy estate or trustee, any persons

or entities pursuing individual arbitration claims against the Defendants who has not stayed the arbitration claim to participate in this action, and any persons or entities that previously released claims against the Defendants.

141.    Thousands of persons or entities are believed to be members of the putative Class, and those persons or entities are geographically dispersed.  Therefore, joinder is impracticable pursuant to FRCP Rule 23(a)(1).

142.    Common issues of fact or law predominate over individual issues within the meaning of FRCP Rule 23(a)(2).  Common issues of law and fact include but are not limited to:

(a)    whether Defendant CrowdStreet's business activities fall within the definition of a "dealer" under the Texas Securities Act;

(b)    whether Defendant CrowdStreet was required to register as a broker-dealer with FINRA or the State of Texas;

(c)    whether Defendant CrowdStreet was exempt from registration as a broker-dealer;

(d)    whether Defendant CrowdStreet violated the Texas Securities Act;

(e)    whether the Control Person Defendants had the ability to directly or indirectly control Defendant CrowdStreet; and

(f)    whether Defendants were unjustly enriched by Defendant CrowdStreet's unregistered broker-dealer activity;

(g)    whether Defendants willfully violated the Texas Securities Act; and

(h)     the proper measure of damages or the nature and scope of other remedies to which Plaintiffs and the Class are entitled.

143.    Plaintiffs' interests are typical of, and not antagonistic to the interests of, the Class.

144.    Plaintiffs have retained competent counsel experienced with class actions and complex litigation and intend to vigorously prosecute this action.

145.    A class action is superior to all other methods for the fair and efficient adjudication of this controversy.  Indeed, given the relatively small size of Class members' individual claims, a class action is the only method by which Plaintiffs, the Class can efficiently seek redress and obtain a uniform adjudication of their claims.

146.    The size of individual damages is small in comparison to the scope and scale of the Defendants' alleged violations of law.  Plaintiffs do not anticipate any difficulties in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
**Violations of § 4004.051 of the Texas Securities Act**
**(Plaintiffs and the Class against Defendant CrowdStreet, Inc.)**

147.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

148.    Under Tex. Gov't Code Ann. § 4004.051, a dealer or other person or company, including a corporation or firm, may not, directly or through the dealer's or other person's or company's agents, offer for sale, sell, or make a sale of any securities in Texas unless the dealer or other person or company is first registered as provided by the TSA.

149.    Under Tex. Gov't Code Ann. § 4008.051(a)(1), of the Texas Securities Act, a person who offers or sells a security in violation of § 4004.051 of the Texas Securities Act is liable to the person buying the security from him, who may sue either at law or in equity for rescission or for damages if the buyer no longer owns the security.

150.    As alleged herein, Defendant CrowdStreet was at all relevant times engaged in selling,

offering for sale or delivery or soliciting subscriptions to or orders for, or undertaking to dispose of, or to invite offers for any security or securities, and otherwise dealt in securities within the State of Texas.

151.    At all relevant times, Defendant CrowdStreet's activities fell within the scope of the definition of a "broker" and a "dealer" under the Texas Securities Act.

152.    Defendant CrowdStreet has never registered as a broker-dealer with FINRA or the State of Texas as required by the Texas Securities Act.

153.    Defendant CrowdStreet sold, offered for sale, solicited subscription or orders for, undertook to dispose of, invited offers for securities to the Plaintiffs and the Class without registering as a broker-dealer with FINRA or the State of Texas as required by the Texas Securities Act.

154.    By engaging in the conduct described above but failing to register as a broker-dealer, Defendant CrowdStreet violated, and unless restrained and enjoined, will continue to violate, the Texas Securities Act by acting as an unregistered broker-dealer.

155.    As a direct and proximate result of Defendant CrowdStreet's misconduct, Plaintiffs and the Class have been damaged thereby and seeks rescission under § 4008.051(b)(1), costs under § 4008.060(a) reasonable attorneys' fees under § 4008.060(b) of the TSA.

### COUNT II
### Control Person Liability Under § 4008.055 of the Texas Securities Act
### (Plaintiffs and the Class against the Control Person Defendants)

156.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

157.    Defendant CrowdStreet is liable to the Plaintiffs and the Class under Tex. Gov't Code Ann. § 4008.051(a)(1) of the Texas Securities Act for offering and selling securities without

registration as a broker-dealer in violation § 4004.051 of the Texas Securities Act.

158.    Under the TSA, a person who directly or indirectly controls a seller of a security is liable under §§ 4008.051 is jointly and severally with the seller to the same extent as the seller.

159.    Given their respective capacities as Chief Executive Officer and Chief Investment Officer of Defendant CrowdStreet, upon information and belief, each of the Control Person Defendants had the actual power and ability to influence Defendant CrowdStreet's business operation as an unregistered broker-dealer. Upon information and belief, each of the Control Person Defendants were advised of the risks of operating as an unregistered broker-dealer, and caused Defendant CrowdStreet to alter its business model and register a broker-dealer to become compliant with state and federal securities laws.

160.    Upon information and belief, given their knowledge of CrowdStreet's lack of broker-dealer registration, the risks associated with CrowdStreet acting as an unregistered broker-dealer, and the business decision to assume the risks of operating CrowdStreet as an unregistered broker-dealer, the Control Person Defendants cannot show that they could not have known of the existence of the facts by reason of which the liability is alleged to exist.

161.    As a result, the Control Person Defendants are jointly and severally liable to the Plaintiffs and the Class.

### COUNT III
**Unjust Enrichment**
**(Plaintiffs and the Class against Defendants)**

162.    Plaintiffs reallege and incorporate by reference each and every allegation contained in the paragraphs above as though fully set forth herein.

163.    Defendants have received and retained a benefit from Plaintiffs and the Class and inequity has resulted.

164.    Defendants have benefitted from offering and selling securities to the Plaintiffs and the Class when they knew or should have known that it was unlawful for them to enjoy the benefit of receiving transaction-based compensation comparable to that of what a registered broker-dealer would receive, and personal compensation and benefits resulting therefrom, without CrowdStreet bearing the burden of registering as a broker-dealer with FINRA or the State of Texas.

165.    It is inequitable for Defendants to retain these benefits based on the misconduct alleged herein.

166.    Plaintiffs were not aware of the true facts about Defendants' non-compliance with applicable regulatory requirements regarding broker-dealer registration.

167.    Defendants knowingly accepted the benefits of its unjust conduct.

168.    As a result of Defendants' conduct, the amount of its unjust enrichment should be disgorged, in an amount according to proof.

## JURY DEMAND

169.    Plaintiffs demand a trial by jury on all claims so triable.

## PRAYER FOR RELIEF

170.    Wherefore, Plaintiffs respectfully request the Court grant Plaintiffs and the Class following relief against Defendants:

a.    Ordering that this action proceed as a class action as to all claims alleged herein;

b.    Awarding rescission and pre-judgment interest under Tex. Gov't Code Ann. § 4008.056;

c.    Award costs under Tex. Gov't Code Ann.§ 4008.060(a);

d.    Awarding reasonable attorneys' fees under Tex. Gov't Code Ann.§ 4008.060(b);

e.    Disgorgement of any ill-gotten gains and unjust enrichment received by Defendants;

f.    Punitive damages;

g.    Granting a preliminary and permanent injunction against Defendants prohibiting them from directly or indirectly, marketing, selling, offering for sale, inviting offers, or soliciting subscriptions or orders for any security or securities on behalf of an issuer;

h.    Granting a preliminary and permanent injunction against Defendants prohibiting them from directly or indirectly, selling, offering for sale or delivery, soliciting subscriptions to or orders for, undertaking to dispose of, or inviting offers for any security, or otherwise effecting or facilitating any securities transactions for a fee;

i.    A declaration that Defendants each willfully violated the Texas Securities Act by failing to register CrowdStreet as a broker-dealer; and

j.    Granting such other and further relief as this Court deems just and proper.

Dated: March 14, 2025                               **BOIES SCHILLER FLEXNER LLP**

By:  */s/ Adam R. Shaw*
     Adam R. Shaw, Bar No. 502142
     30 South Pearl Street, 12th Floor
     Albany, NY 12207
     Tel.: (518) 434-0600
     Fax: (518) 434-0665
     ashaw@bsfllp.com

     Marc Ayala (pro hac vice forthcoming)
     333 Main Street
     Armonk, NY 10504
     Tel.: (914) 749-8200
     Fax: (914) 749-8300
     mayala@bsfllp.com

**LAW OFFICES OF JOSHUA B. KONS, LLC**

Joshua Kons (pro hac vice forthcoming)
92 Hopmeadow Street, Suite 205
Weatogue, CT 06089
Tel.: (860) 920-5181
joshuakons@konslaw.com

**STOLTMANN LAW OFFICES, P.C.**

Joseph Wojciechowski (pro hac vice forthcoming)
Sara Hanley (pro hac vice forthcoming)
Stoltmann Law Offices, P.C.
2000 Center Drive, Suite East C218

Hoffman Estates, IL 60192
Tel: (312) 332-4200
joe@stoltlaw.com
sara@stoltlaw.com