UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| **Vipul Shah, Samemma Holdings, LLC,** § <br> **Steve Wions, and Dolph Haege,** § <br> *Plaintiffs* § <br> § <br> **v.** § <br> § <br> **CrowdStreet, Inc., Tore Steen, and** § <br> **Ian Formigle,** § <br> *Defendants* § | **Case No. 1:25-CV-00383-ADA-SH** |

**ORDER AND REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

TO: THE HONORABLE ALAN D ALBRIGHT
    UNITED STATES DISTRICT JUDGE

Before the Court are Defendants' Motion to Compel Individual Arbitration, Stay this Action, and Strike Class Claims and Allegations, filed April 11, 2025 (Dkt. 11); Plaintiffs' Motion Requesting Oral Argument, filed May 30, 2025 (Dkt. 23); and the associated response and reply briefs.[1]

## I. Background

Plaintiffs Vipul Shah, Samemma Holdings, LLC, Steven Wions, and Dolph Haege, individually and on behalf of all other persons similarly situated, bring this putative class action under the Texas Securities Act against Defendants CrowdStreet, Inc. and its corporate officers Tore Steen and Ian Formigle. CrowdStreet is an Austin, Texas-based financial services company that "purported to operate an online marketplace" through which investors purchased securities offered for sale by issuers of securities, typically real estate sponsors or developers." Complaint,

---

[1] The District Court referred the case to this Magistrate Judge for a report and recommendation on dispositive motions and disposition of non-dispositive motions, pursuant to 28 U.S.C. § 636(b), Federal Rule of Civil Procedure 72, Rule 1 of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, and the District Court's Standing Order on referrals to Magistrate Judges.

Dkt. 1 ¶ 2. Plaintiffs allege that from 2012 through 2022, CrowdStreet did not merely operate as a "marketplace" but acted as "a securities broker without registering as a broker dealer with the State of Texas or any other authority." *Id.* ¶ 4.

Plaintiffs are real estate investors who signed up for CrowdStreet's services and bought securities from its website between 2019 and 2022. *Id.* ¶¶ 17-20. To buy securities on CrowdStreet's website, Plaintiffs had to create a user profile and open an "Investing Account." Dkt. 11-1 ¶ 4. To open an account, Plaintiffs were required to agree to CrowdStreet's "Terms of Use" or "Terms of Service." *Id.* Those Terms of Use and Terms of Service included certain arbitration provisions requiring users to arbitrate certain disputes against CrowdStreet. Dkts. 11-2 at 20-21, 11-3 at 13, 11-4 at 6-7.

In 2022, Plaintiffs purchased securities in New York-based real estate development firm Nightingale Properties, LLC, that were offered on the CrowdStreet website. Dkt. 1 ¶ 125. Plaintiffs allege that CrowdStreet aggressively marketed the Nightingale securities and raised more than $62 million from its customers. Plaintiffs allege that the Nightingale securities "turned out to be a complete fraud" and that they suffered substantial financial losses. *Id.* ¶ 126.

Plaintiffs allege that CrowdStreet violated the Texas Securities Act by acting as a securities broker-dealer without registering as a broker-dealer with the State of Texas or any other authority. *Id.* ¶ 4. Plaintiffs also assert an unjust enrichment claim and seek "recission of more than $1 billion of investments made through CrowdStreet." *Id.* ¶ 1. They seek to certify a nationwide class of "all persons who purchased any securities offered, sold, or otherwise displayed on the CrowdStreet Platform within the applicable statute of limitations period." *Id.* ¶ 139.

Defendants now invoke the Federal Arbitration Act and ask the Court to (1) compel the parties to individual arbitration, (2) stay this action pending the resolution of the arbitration, and (3) strike

Plaintiffs' class action claims and allegations. Plaintiffs oppose the motion and request a hearing. Dkt. 23. Because the Court finds that oral argument is unnecessary, Plaintiffs' request is denied.

## II. Legal Standards

The Federal Arbitration Act ("FAA") was enacted "to reverse the longstanding judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The FAA provides that arbitration provisions "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under Section 4 of the FAA, a party may move to compel arbitration "when one party has failed, neglected, or refused to comply with an arbitration agreement." *Gilmer*, 500 U.S. at 25. If the Court finds that a dispute is subject to arbitration, the Court must stay the proceeding. *Smith v. Spizzirri*, 601 U.S. 472, 476 (2024); 9 U.S.C. § 3.

To determine whether a party should be compelled to arbitration, courts follow two analytical steps. *Kubala v. Supreme Prod. Servs., Inc.*, 830 F.3d 199, 201 (5th Cir. 2016). First, the court applies state contract law to determine whether the parties entered into "*any arbitration agreement at all*." *Id.* Second, the court interprets the contract "to determine whether *this* claim is covered by the arbitration agreement." *Id.* Ordinarily, both steps are questions for the court. *Id.* "But where the arbitration agreement contains a delegation clause giving the arbitrator the primary power to rule on the arbitrability of a specific claim, the analysis changes." *Id.* Delegation clauses "transfer the court's power to decide arbitrability questions to the arbitrator." *Id.*

The party moving to compel arbitration has the initial burden of demonstrating that a valid arbitration agreement exists. *In re JP Morgan Chase & Co.*, 916 F.3d 494, 502 (5th Cir. 2019). If the movant meets this burden, the burden shifts to the nonmovant to demonstrate either that the

agreement is invalid or that the claims are outside the agreement's scope. *Carter v. Countrywide Credit Indus., Inc.*, 362 F.3d 294, 297 (5th Cir. 2004). Because of the "liberal federal policy" favoring arbitration agreements, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983).

### III.   Analysis

The Court first considers the relevant arbitration provisions. CrowdStreet's 2016 Terms of Service, 2021 Terms of Service, and 2022 Terms of Use are relevant to Plaintiffs' claims.

The 2016 and 2021 Terms of Service provide:

> These Terms of Service govern your access and use of the Website and all publicly available content, services and/or products provided through the Website (collectively, the "Services"). . . .
>
> The Services are offered to you subject to your acceptance without modification of all the terms and conditions contained herein and all other operating rules, policies (including without limitation CrowdStreet's Privacy Policy), any future modifications that may be published from time to time without notice to you or liability for such change on the Website or otherwise provided to you, and any additional terms and conditions to which you have agreed in connection with specific features, applications, products, or services provided by the Website or the Services (collectively, the "Terms"). In order to access certain features of the Services, you will have to create an account and become a registered user of the Services. . . .
>
> BY ACCESSING, BROWSING, AND/OR OTHERWISE USING THE WEBSITE OR THE SERVICES, YOU ACKNOWLEDGE THAT YOU HAVE READ, UNDERSTOOD, AND AGREE TO BE BOUND BY THE TERMS OF SERVICE AND ALL OTHER POLICIES AND PROCEDURES POSTED ON THE WEBSITE. IF YOU DO NOT AGREE TO BE BOUND BY SUCH AGREEMENTS, THEN YOU MUST IMMEDIATELY CEASE ACCESS, BROWSING OR OTHERWISE USE THE WEBSITE OR THE SERVICES.

***

> Your use of the Website and the Services is governed by the then-current version of the Terms in effect on the date of such use. CrowdStreet may, at its sole discretion, modify the Terms and/or other policies and procedures governing the Service at any time without notice or liability by posting the modified Terms, policies or procedures to the Website and revising the "Updated" date. Your continued use of the Services after modified Terms have been posted or otherwise provided to you constitutes your agreement to be bound by the then-current Terms.

Dkts. 11-2 at 2-3, 11-3 at 2. The 2016 and 2021 Terms of Service also contain the following arbitration provision:

> In the event of any claim, controversy or alleged dispute between you and CrowdStreet, its members or affiliates . . . . Each party agrees to submit any Dispute for resolution by final binding arbitration after serving written notice . . . . Upon such notice and attempt to resolve, the party may then commence arbitration, which, unless the parties agree otherwise in writing, will be administered by and in accordance with the rules of the Arbitration Service of Portland, Inc. The place of arbitration will be Multnomah County, Oregon. The award rendered by the arbitrator will be final and binding, and judgment may be entered on the award in any court having jurisdiction . . . .
>
> . . . You agree that all Disputes will be limited between you, individually, and CrowdStreet. To the full extent allowable by law, you agree that no arbitration proceeding or other dispute resolution proceeding shall be joined with any other party or decided on a class-action basis.

Dkts. 11-2 at 20-21 ("2016 Arbitration Provision"), 11-3 at 13 ("2021 Arbitration Provision").

The 2022 Terms of Use provide:

> By accessing the Website, establishing a login on our Website, completing a profile ("User Profile"), establishing an investing account ("Investing Account"), or using any Services, you agree that you have read, understand, and accept all of the terms and conditions contained in these Terms of Use, including our Investment Risks Disclosure, Privacy Policy, E-Sign and Electronic Delivery Consent, and Regulatory Disclosures. Your compliance with these Terms of Use is a condition to your access to and use of the Website and Services.
>
> We may amend or modify the Terms of Use at any time by posting the Terms of Use on the Website. We will notify Users of our updated Terms of Use by e-mail, notice on our Website, or similar means. The revised Terms of Use shall be effective on the date posted, but will not apply

5

> retroactively. Your continued access to or use of the Website or Services after posting of revised Terms of Use constitutes your acceptance of the revised Terms of Use. If you do not agree to the revisions, your sole and exclusive remedy is to terminate your use of the CrowdStreet Site and Services.

Dkt. 11-4 at 2. The 2022 Terms of Use also contain the following arbitration provision:

- **Binding Arbitration. Except as set forth in Section 4.2[2] with respect to brokerage services, or as provided in an applicable Investment Advisory Agreement with respect to advisory services, any claim, controversy or dispute (each a "Dispute") arising out of or related to the Website, Services, or these Terms of Use shall be subject to binding individual arbitration administered by the American Arbitration Association before a single arbitrator in Austin, Texas.** You and CrowdStreet waive their respective rights to (i) have Disputes resolved in a court, (ii) a jury trial, (iii) a class arbitration, class action, multi-party, or representative proceeding. . . .

*Id.* 6-7 ("2022 Arbitration Provision").

### A. Did the parties enter into any arbitration agreements?

Determining whether there is a valid arbitration agreement is a question of state contract law for the Court. *Kubala*, 830 F.3d at 202. The parties agree that Texas law applies. Defendants, as the party moving to compel arbitration, "must show that the agreement meets all of the requisite

---

[2] It appears that the reference to "Section 4.2" in the Terms of Use was a clerical error and that CrowdStreet meant to refer to "Disputes Related to Brokerage Services" provision in Section 5:

> **Disputes Related to Brokerage Services**. Any controversy, claim or dispute arising out of or relating to brokerage services provided to you or an Investing Account (each a "**Brokerage Dispute**") shall be resolved by arbitration before FINRA Dispute Resolution, Inc. ("FINRA Arbitration") in accordance with FINRA's Code of Arbitration Procedure for Customer Disputes. Section 5.1 of these Terms of Use shall not apply to Brokerage Disputes.
>
> Pursuant to FINRA rules, no person shall bring a Brokerage Dispute asserted as a putative or certified class action to FINRA Arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action with respect to a Brokerage Dispute or who is a member of a putative class who has not opted out of the class with respect to any Brokerage Dispute claims encompassed by the putative class action until: (1) the class certification is denied; (2) the class is decertified; or (3) the person is excluded from the class by the court.

Dkt. 11-4 at 7.

contract elements." *Huckaba v. Ref-Chem, L.P.*, 892 F.3d 686, 688 (5th Cir. 2018). Under Texas law, those elements are (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) mutual assent or a "meeting of the minds"; (4) each party's consent to the contract's terms; and (5) execution and delivery of the contract with intent that it be mutual and binding. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

Defendants argue that Shah agreed to the 2016 Arbitration Provision when he created his Investing Account on March 15, 2019. To create his Investing Account, Shah had to click on a "Sign-up" button. Dkt. 11-1 at 9. Immediately beneath the Sign-up button, the account creation page stated: "By signing up for CrowdStreet, you confirm that you accept our terms of service . . . ." *Id.* The words "terms of service" appeared in a blue hyperlink that linked to the 2016 Terms of Service. *Id.* On June 15, 2022, CrowdStreet emailed Shah notifying him of the updated terms contained in the 2022 Terms of Use. Dkt. 11-6. CrowdStreet's email included a hyperlink to the 2022 Terms of Use, which contained the 2022 Arbitration Provision. Shah continued to use the website and make investments after receiving the updated terms. Dkt. 11-1 at 10. Thus, Defendants argue that Shah agreed to the 2022 Arbitration Provision as well.

Defendants argue that Haege agreed to the 2016 Arbitration Provision when he created his Investing Account on March 30, 2020, and clicked on the checkbox next to the statement "I agree to the Terms of Service. I have read this agreement and accept the terms and conditions." *Id.* at 11. The words "Terms of Service" appeared in blue, offsetting them from the surrounding black text, and hyperlinked to the 2016 Terms of Service. *Id.* On June 15, 2022, CrowdStreet emailed Haege notifying him of the 2022 Terms of Use and including a link to them. Dkt. 11-7. Haege continued to use the website and make investments after that date. Dkt. 11-1 at 12. Thus, Defendants argue that Haege also agreed to the 2022 Arbitration Provision.

7

Defendants contend that Wions agreed to the 2022 Arbitration Provision when he created his Investing Account on behalf of Samemma Holdings on November 2, 2022. Wions clicked on the checkbox next to the statement "I have read and accept the terms and conditions." *Id.* at 13. The words "terms and conditions" appeared in teal and were underlined, offsetting them from the surrounding black text, and hyperlinked to the 2022 Terms of Use. *Id.* Since agreeing to the 2022 Terms, Wions has accessed and used CrowdStreet's website to make investments on Samemma's behalf. *Id.* Thus, Defendants argue that Wions agreed to the 2022 Arbitration Provision on behalf of Samemma Holdings.

Plaintiffs do not dispute that they entered into the arbitration agreements when they created their Investing Accounts. Instead, they argue that "the only real question for this Court to answer is whether Defendants have proven that this putative class's claims are not a 'Brokerage Dispute' subject to the express exclusion from individual arbitration." Dkt. 17 at 6; *see also id.* at 7 n.2 (acknowledging that Plaintiffs created Investing Accounts and agreed to the Terms of Service and Use when creating their accounts).

Because Plaintiffs do not dispute that Defendants have met their burden to show that the parties entered into a valid arbitration agreement, the Court turns to the question of contract interpretation and asks whether Plaintiffs' claims are covered by the Arbitration Provisions. *Kubala*, 830 F.3d at 201.

**B. Does the dispute fall within the scope of the arbitration agreements?**

Plaintiffs argue that their claims do not fall within the scope of the arbitration agreements because they are asserting brokerage dispute claims, which are excluded under the 2022 Arbitration Agreement. Defendants contend that whether Plaintiffs' claims fall under the 2022 Arbitration Agreement is a question for the arbitrator and not the Court because the parties agreed to delegate such questions to the arbitrator.

As stated, whether a claim is covered by the arbitration agreement ordinarily is a question for the Court. *Kubala*, 830 F.3d at 201.

> But the analysis changes where the agreement delegates to the arbitrator the primary power to rule on the arbitrability of a specific claim. In such a case, we ask only whether there is a valid delegation clause. If there is, then the *arbitrator* decides whether the claim is arbitrable.

*In re Willis*, 944 F.3d 577, 579-80 (5th Cir. 2019) (citations omitted). Thus, "a valid delegation clause requires the court to refer a claim to arbitration to allow the arbitrator to decide gateway arbitrability issues." *Kubala*, 830 F.3d at 202.

> If the party seeking arbitration points to a purported delegation clause, the court's analysis is limited. It performs the first step—an analysis of contract formation—as it always does. But the only question, after finding that there is in fact a valid agreement, is whether the purported delegation clause is in fact a delegation clause—that is, if it evinces an intent to have the arbitrator decide whether a given claim must be arbitrated. If there is a delegation clause, the motion to compel arbitration should be granted in almost all cases.

*Id.*

Defendants identify the delegation clause in Section 5 of the 2022 Terms of Use:

- **Authority of Arbitrator.** The terms of this arbitration agreement affect interstate commerce and the enforceability of this section will be both substantively and procedurally governed by and construed and enforced in accordance with the Federal Arbitration Act, 9 U.S.C. § 1 et seq. to the maximum extent permitted by applicable law. Subject to those rules and the terms of this arbitration agreement, the arbitrator will have (i) the exclusive authority and jurisdiction to make all procedural and substantive decisions regarding a Dispute, including the determination of whether a dispute is arbitrable, and (ii) the authority to grant any remedy that would otherwise be available in court; provided, however, that the arbitrator does not have the authority to conduct a class arbitration or a representative action, which is prohibited by the terms. The arbitrator may only conduct an individual arbitration and may not consolidate more than one individual's claims, preside over any type of class or representative proceeding or preside over any proceeding involving more than one individual.

Dkt. 11-4 at 6-7. Defendants argue that this delegation clause requires the arbitrator to decide whether Plaintiffs' claims fall under the brokerage services exception in the Arbitration Agreement. The Court agrees that the delegation clause "evinces an intent to have the arbitrator decide whether a given claim must be arbitrated." *Kubala*, 830 F.3d at 202; *see also In re Willis*, 944 F.3d at 583 n.19.

While Plaintiffs concede that the 2022 Terms of Use "apply to the current action because they supersede the earlier terms" and the 2022 Terms of Service contain a delegation clause, they argue that the delegation clause does not apply to brokerage dispute claims. Dkt. 17 at 12. Plaintiffs argue that the delegation clause does not apply to disputes related to brokerage services because the "Disputes Related to Brokerage Services" provision in Section 5.2 of the 2022 Terms of Use states that "Section 5.1 of these Terms of Use shall not apply to Brokerage Disputes." Dkt. 11-4 at 7. Plaintiffs also contend that the delegation provision conflicts with the Disputes Related to Brokerage Services provision in Section 5.2 because that section does not contain a delegation provision. Plaintiffs argue that this Court must determine whether Plaintiffs' claims are brokerage dispute claims excluded from the 2022 Arbitration Provision requiring disputes to be arbitrated before the AAA in Austin.

Plaintiffs' arguments are unavailing because (1) the clear terms of the delegation clause require the arbitrator to determine whether Plaintiffs' claims fall under the Arbitration Provision, and (2) the delegation clause does not conflict with Section 5.2. The delegation clause requires the arbitrator to have "the exclusive authority and jurisdiction to make all procedural and substantive decisions regarding a Dispute, including the determination of whether *a dispute* is arbitrable." The provision contains no exception for brokerage claims. "[T]he fact that the parties' arbitration agreement may cover only some disputes while carving out others does not affect the fact that the

10

delegation agreement clearly and unmistakably requires the arbitrator to decide whether the present disputes must be resolved through arbitration." *TotalEnergies E&P USA, Inc. v. MP Gulf of Mexico, LLC*, 667 S.W.3d 694, 719 (Tex. 2023). In addition, when the parties' contract assigns a matter to arbitration, "a court may not resolve the merits of the dispute even if the court thinks that a party's claim on the merits is frivolous." *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 70 (2019).

This Magistrate Judge finds that the arbitrator must determine whether Plaintiffs' claims fall under the Arbitration Provision.

### IV. Defendants' Motion to Strike Class Claims and Compel Individual Arbitration

Defendants also ask the Court to strike Plaintiffs' class claims and allegations because the Terms of Service and Use preclude such claims. Defendants cite three cases in which district courts struck class action claims when the arbitration provision precluded such claims. *See* Dkt. 11 at 22 (citing *Flores v. BJ's Rests., Inc.*, No. 1:21-CV-1185-DII, 2024 WL 3455271, at *2 (W.D. Tex. Jan. 3, 2024); *Bradford v. Brident Dental Servs., LLC*, No. H-23-3460, 2024 WL 1839458, at *7 (S.D. Tex. Apr. 26, 2024); *Martin v. CB Rests., Inc.*, No. 5:20-CV-1334-DAE, 2021 WL 2701952, at *8 (W.D. Tex. Mar. 12, 2021)).

None of the cited cases involved delegation clauses. Because the delegation clause here requires the arbitrator to determine which claims fall under the Arbitration Provisions, whether the class claims are precluded is an issue for the arbitrator, not the Court. This Magistrate Judge recommends that the District Court deny Defendants' Motion to Strike Class Claims and request for individual arbitration.

## V.     Order and Recommendation

For these reasons, this Magistrate Judge **RECOMMENDS** that the District Court **GRANT IN PART and DENY IN PART** Defendants' Motion to Compel Individual Arbitration, Stay this Action, and Strike Class Claims and Allegations (Dkt. 11). The Court **RECOMMENDS** that the District Court **GRANT** the Motion to Compel Arbitration and stay this action but **DENY** all other requests for relief.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion Requesting Oral Argument (Dkt. 23) is **DENIED**.

## VI.     Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985).

**SIGNED** on July 11, 2025.

_____
SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE